Freeman, J.,
delivered tbe-opinion of tbe court:
Tbis bill was filed in 1868, to enforce a supposed liability of Tate, as accommodation indorser for James A. Cannes, dated 24tb day of January, 1860, due 14t-b of February, 1861.
Tbe note was not demanded at tbe place of payment, to wit: Tbe branch of tbe Planters’ Bank of Tennessee, at Memphis, nor, as a consequence, any protest for nonpayment when it fell dne. Tbis is excused in tbe bill on tbe ground that tbe agent of complainant failed to have it done, because Tate had waived demand, and requested it should, not be protested; that in consequence of tbis request on *404 tbe part of Tate, tbe legal steps were not taken to fix bis liability, as would have otherwise been done.
This excuse for want of demand and notice, or protest, is denied by Tate in an answer not sworn to, oatb being waived in tbe bill, and thus an issue is presented distinctly between the parties on tbe aspect of tbe case, to be solved by tbe testimony of tbe case. There can be no question that an indorser may waive bis right to have demand made of tbe matter, and due notice of failure to pay, and that parol proof of such waiver may be made. Dick v. Martin, 7 Hum., 264. Tbe proof of such waiver made before dishonor of tbe paper will render tbe indorser liable on tbe paper as if due notice bad been given. Edwards on BilLs and Notes, top p. 595. Any conduct on tbe part of the indorser calculated to, and actually inducing the bolder to omit serving him with regular notice, will have "the same effect. Ibid., 595. Says Mr. Story, Prom. Notes, sec. 279: “In many cases the promise of an indorser, either prior or subsequent to the maturity of tbe note, is relied on as evidence to establish a waiver of due presentment or due notice of the dishonor of tbe note, and all the circumstances of the case must then be taken into consideration, in order to ascertain whether tbe promise does or does not amount to such a waiver.” 7 Hum., 264.
It has been held, and we think correctly, that where a party wrote to the holder of a note, on which .he was in-dorser, not to protest it, that he would waive the necessity of protest, that this dispensed with necessity of demand also, and such meaning must be given to the language or it would be destitute of all meaning. Coddington v. Davis, 1 Comst. (N. Y. R.), 190. In fact, we take it, this would be the fair meaning of such a request as understood by business men; certainly so, unless the language was qualified at the time expressly by the idea that a demand, however, must or should be made at maturity of the paper. To- protest the paper with us, always involves the idea, *405 not only of the formal declaration of the notary of the demand and failure to pay, but also the other fact, we believe always recited in or on the notarial protest, that due notice had been given to the parties to the instrument, whose liability depended on its due dishonor and notice of the fact. This is especially so in our state, where the notary’s certificate in all such cases, that he gave notice'of the dishonor of the paper, is made prima facie evidence of the fact of such notice. See act of 1827; Code, sec. 1801 [Shannon’s Code, sec. 3206.] We think it would be a fraud on the holder if a party should waive the protest of the paper, and be permitted afterwards to show that he did not intend to thereby waive demand and notice, but only the formal declaration of the notary protesting the paper. This would be to insist upon a technical nicety, that would never have entered into the mind of the holder, as intended at the time,’ and ought not to be allowed. We are aware that there are cases holding to the contrary, but we do not think that they ought to be followed.
. The fact of the waiver of the ordinary steps to fix the liability of the indorser is to be made out in proof, and some unequivocal proof, but all this can, when applied to the facts of the case, only mean that when it appears no notice had been given of dishonor, and the indorser is prima facie discharged, that this must be overturned by proof satisfactory that notwithstanding this he is by his own act or agreement liable.
With these principles before us, we examine the testimony in this ease to see whether Tate has either expressly waived notice of demand at the bank, or notice to himself of dishonor of the note.
The proof shows that the note was for money loaned by Moore to Carnes, and that the note had been previously renewed, probably three times. That it had been reported in the case of the firm of 3T. Lane & Co., 'by Moore, who held it either for renewal or collection, or receipt of the *406 money, if the maker preferred to pay it. That it bad been allowed, probably the year before, to pass some time after due, without payment, but was again renewed, or renewed after this time, and Tate indorsed it without objection. That he and Carnes were brothers-in-law, on the most intimate terms, both men of wealth and high standing, and Tate, the general indorser for Carnes on paper of the kind.
Newton Ford, a member of the firm of Lane & Co., testifies very definitely that about the time the note fell due, either a few days before, or on the day, he had a conversation with Tate on the subject of the note, who said to him Mr. Carnes would be up in, a short time and would renew the note; that he would indorse it, and that it was unnecessary to. protest it. He swears definitely that it 'was because of this statement of Tate, and the fact that previously the same course had been pursued, Tate not objecting, that the note was not protested regularly. Mr. Tate, in his deposition, denies that he made the statement sworn to by .Ford, or in any way waived demand and notice.
So far, we have one witness against another. In Tate’s depositions there are several circumstances to' be noted, as tending more or less to weaken the force of his denial and strengthen the statement of Ford. In his examination in chief, he says, about the time the note matured, he met Ford on the street, whether before or after the maturity of the note he can’t say; he produced no note, and “we had a conversation in relation to the same note, which he said he held, made by Carnes, and indorsed by me; said he was Carnes’ general indorser. ’ ’ It might have been this or some other note he had reference to. It is not pretended, however, that Ford ever had any other note but this one in his hands of the firm’s. He, however, goes on to say, after denying positively that he waived notice: “I may have said to him, and probably did, that Carnes *407 would be up here soon, and arrange the matter, and was perfectly good as the drawer of the note.” On cross-examination, however, he admits that .Ford, at some time or other, did tell him he had a note for collection, and he thinks it was about the time of the maturity of the note in dispute. Taking all these statements, we feel sure that the conversation referred to by Ford was had between him and Tate, and that each refers to the same conversation, the one remembering the point in which he felt most interested; the fact that Tate requested not to protest the paper, and the other not calling it up distinctly, especially this part of it. At any rate, here is the fact of the conversation on the subject of the note, about the time of its maturity, in corroboration of the statement of Ford.
In further progress of the cross-examination Tate admits having had the conversation referred to in the answer we have first quoted, and that it was about this note.
Mr. Johnson, bookkeeper of F. Lane & Co., is introduced, who proves that this note had been renewed several times before, and on one occasion, in a conversion between Tate, the indorser, and Ford, Tate said to him that should the note mature during his absence, it would not be necessary to protest it, and to withdraw it from bank, and he would indorse a renewal note at any time. This circumstance shows that in reference to this paper, Tate did nor wish it protested; that it was expected to be renewed from time to time. The proof shows, too, that his brother-in-law, Carnes, was a planter in Mississippi, was frequently absent on his farm, and Tate, president of the Memphis & Charleston road, and, as indicated by the statement, liable to be absent, also, frequently from the city. Taking all these facts together, we think the additional fact that Ford did not have the paper dishonored when it fell due — that he is shown to have been an accurate and reliable business man, and he swears positively that his failure to have the note protested was in consequence of the conversation *408 had with Tate, and that Tate, though hesitatingly, admits that a conversation was had between them about the paper, about the time of the maturity of the paper, that these facts, in connection Avith the circumstances, satisfactorily show that Tate did request that the note be not protested, and its not being done was induced by his own conduct, which estops him now to set up the want of notice, to escape liability. The fact is, we have, no- question that Carnes was absent, and Tate being perfectly willing to indorse a renewed note, did not wish his name dishonored commercially, nor the expense of a protest, when he had no purpose or desire to be relieved of his position as indor-ser, but expected to continue in that position by indorsing new note on renewal. Carnes was wealthy then, and there was no danger incurred by such an indorsement. The misfortune of Avar made him poor, as it did many others, and his estate noAv is said to be insolvent. But wo must look at the transaction in the light of surrounding circumstances at the date of the transaction, and thus arrive at the truth of the case. We have endeavored to do so, and feel satisfied as to the correctness of our conclusions.
The next question presented is as to the liability of the land claimed by Mrs. Gill, the daughter of Mr. Tate, to be subjected to the discharge of this debt.
After a careful examination, avc do not deem it necessary to go into a discussion of the several interesting questions of laAv discussed by counsel in argument. Assuming the conveyance of tho property in January, 1867, to Mrs. Gill to have been voluntary, and prima facie fraudulent in laAv, as against existing creditors, and that it devolves on the parties seeking to save the property from the claims of creditors to sIaoav its validity, by showing that the maker of the conveyance had reserved at the time ample means for the payment of his debts, and that the debt or. debts due by him were not imperiled by the conveyance; under these well established rules, Ave think complainant fails *409 of bis case. Tbe proof shows by tbe deposition of Mr. Tate, with a schedule of his property filed, showing its nature and hind, that he had property in lands, stocks, and debts due him, of $239,000. This is the amount given in the schedule, but he says he has considerable means in addition to this, consisting of lands in Mississippi, and other stocks, as well as cash assets, not recollected when giving his depositions. It is true that in 1870, when the deposition was taken, he says a large portion of the property embraced in said schedule did not then belong to him, 'having been sold to meet liabilities which have unexpectedly arisen since the deed (of 1867), and which were not then anticipated. Yet, the statement cannot change the result. Complainants have not shown that these debts existed at the date of the deed, nor what proportions they bore at the time to the then value of his property. The fact that subsequent events may have reduced the maker of the deed, even to insolvency, is not conclusive evidence of inability to malee a deed of gift to one of his family several years before the event.. It is true that it is circumstance to be weighed with others, in connection with the amount of the settler’s estate at the time the deed is made, in order to arrive at the question of his ability to make the gift and still reserve enough property amply to meet his debts. Yet, it is only one circumstance, and may be met and its force rebutted by showing ample means retained for this purpose.
On looking to the indebtedness shown to exist at the making of the deed, we find it was between $30,000 and $35,000, or about this sum. We do not think this can be held to have been such an indebtedness as would prevent a father making a settlement of property on his daughter, of property worth $15,000, when his assets to meet his debts amounted to $240,000 at least, as shown by schedule and statement of Tate, nominally at least five times the amount of his debts shown then to exist. It may be argued *410 that all these assets were not to be reached by legal process, and that they were not of the real value as that represented in the schedule. But, if this is true, it devolved on the complainant to sift them by proof and show they were not [as] represented by Tate. It also devolved on complainant to show an amount of indebtedness that would develop the fact that the settler was not in condition to make the settlement. In this he has failed, we think, and therefore this conveyance to Mrs. Gill must be valid.
Complainants are, however, entitled to a decree for the amount of the debt against Tate, but not.against the land, under sec. 4292 of the Code [Shannon’s Code, sec. 6101].
Opinion on motion to modify.
Deaderick, J.,
delivered the opinion of the court:
The decree directs the sale of certain property attached at the institution of the suit, upon the allegation of its having been fraudulently disposed of. Upon final decree here for the amount due complainants against Táte and his sureties, it is ordered that certain property attached bo sold.
The application now is to correct this so as to’ discharge the attachment upon the ground that the conveyance of one piece of property was held not to be fraudulent. No application was ever made to discharge the attachment in the court below, or issue made for this purpose, and although the writ may have -been granted on false or unsus-tained allegations in the bill, still having been levied, it would be operative until discharged. We think, therefore, that the decree ordering the sale of the property attached other than that declared in the opinion to have been conveyed without fraud, was proper. This will include also the Elmwood stock.
Such costs as accrued incident to the charge of fraud as to Mrs. Gill’s property, as far as separable from the general costs, should be paid by complainant.
*411 Opinion on application to remand.
Nicholson, C. J.,
delivered tbe opinion of tbe court:
Tbe application in this case is that tbe decreet of the court below be reversed, and the cause remanded, to enable tbe appellant to take newly discovered evidence deemed material to tbe justice of tbe case. Tbe motion is based upon tbe affidavit of the newly discovered witness, in which be states facts inconsistent with and contradictory of that of a witness in tbe court below, on whose testimony tbe decree was rendered.
If we were to reverse tbe decree appealed from on this application, it could only be done upon evidence furnished by tbe affidavit, which would necessarily involve the court in tbe exercise of tbe original jurisdiction. We know no precedent for such action, and if there was, we should hesitate to follow it. Tbe cases in which causes have been remanded are those in which evidence used below has been lost, or in which it is apparent from the record that there is other evidence which could probably be procured, and which is necessary for the attainment of justice.
But the present application falls under neither of these classes, and must be disallowed.